Thank you, Your Honor. May it please the court, Alan Brabender again appearing on behalf of the Forest Service. In this appeal, we're joined at council table by Mr. Bishop of the Montana Wilderness Association. And we agreed to split argument time with this association. I will be using 12 minutes, and I will try to reserve three of those for rebuttal. This case is the flip side of the coin from the appeal we just heard. Here, the judge determined that the Forest Service violated the Montana Wilderness Study Act because it enhanced the wilderness character of the Middle Fork Judith Wilderness Study Area in the Lewis and Clark National Forest, and also violated the National Environmental Policy Act by minimizing the environmental impacts of this decision by modifying a dispersed camping rule and by selecting an alternative at the low end of the range analyzed in the draft EIS. I will first briefly address the study act question. As a factual matter, the district court was wrong. The travel plan was not intended to enhance the wilderness character of the study area, but to maintain it. The Forest Service was acting out of an abundance of motorized use in the area that was physically impacting the landscape, and in particular, habitat for fish species. But even if the travel plan enhanced the wilderness character of the study area, that would not be dispositive. The study act creates a floor and not a ceiling for environmental protection. The act does not prohibit the Forest Service from enhancing the wilderness character of an area. The ordinary meaning of the word maintain is to preserve from failure or decline. And by definition, when you enhance something, you are preserving it from failure or decline. While the legislative history of the act says that motorized use is permissible in study areas, it is also clear that the use is subject to the normal Forest Service travel planning processes. And those processes occur under the National Forest Management Act, which allows the Forest Service to provide for outdoor recreation, among other permissive uses for the forest. And motorized recreation is simply one form of outdoor recreation that the Forest Service has the discretion to provide under multiple use principles. And the district court erred here in concluding that the study act takes that discretion away. The district court also erred in finding that the Forest Service violated NEPA by not preparing a draft supplemental EIS or supplemental draft EIS. Here, due to the public's concerns over the environmental effects of the travel plan, the Forest Service did two things. It modified the dispersed camping rule, which allows people to travel off roads to park, camp, or pass from 300 feet on either side of the trail to a distance of a vehicle length plus a trailer. And it also selected an alternative, authorizing motorized travel on 1,366 miles of road and trail at the lower end of the range it analyzed. NEPA encourages these sorts of modifications to minimize environmental impacts in response to public comments. And NEPA only requires a supplemental analysis if its decision falls outside of the range of alternatives analyzed and makes substantial changes to the proposal that are relevant to environmental concerns. These prerequisites are not here. The modification to the dispersed camping rule didn't require a supplement because it was insubstantial to the overall proposal. Very few people actually take advantage of the dispersed camping rule. It also- Is that noted in the record of the decision? Yes. The statement that you just made? Yes. It's at page 293 of our excerpt of record. The modification is also not relevant to environmental concerns because it simply lessened the environmental impacts. It didn't create any new environmental impacts. Similarly, authorizing travel on 1,366 miles of road and trail at the low end of the range analyzed did not require a supplement. There was a factual question on that, wasn't there? Didn't the district court find that it was outside the range because what it had before it at the time was 12,087 to 2,262 miles. And it said, well, the 1,366 is outside the proposed range. Then you all came in and said, oh, no, that was a mistake, it was 19,351 to 3,036. Well, respectfully, that's backwards. The range analyzed was 1,287 to 2,262, and the 1,366 mile figure falls within that range. Now, the 1,951 to 3,036 mile range that the district court relied on was- I did have it backwards, right? Right. Came about from misreading a table at page 104 of our excerpt of record. When you look at that table, you'll see there are no totals there. It's because these figures are not supposed to be added, because when you do add these figures, it results in double counting. The correct mile figures are at page 117 of our excerpts of record. And there you'll see the range that we state in our brief, and you also see a footnote saying you can't add certain numbers to the totals, otherwise it results in double counting. And it is pretty clear here that this 1,366 mile figure that the Forest Service chose is within the range of alternatives. Could you explain all of this to Judge Haddon? We did point out this in our supplemental filing, which occurred after the hearing, and also in response to the supplemental brief that the recreation groups filed. And you'll see that at page 9 of our further excerpts of record. Now, there's also a threshold problem with this issue, and that is the recreation groups didn't raise this issue to the agency during the administrative process. And this is not something that they were free to just ignore. 7 U.S.C. 6912E requires anybody who claimed before the agency so that the agency may correct the problem. But they didn't raise this issue to the Forest Service, and therefore, this court, the issue is not properly before this court. Did you make that argument in the district court? We did, in the same brief where we pointed out. After the summary judgment? No, it was after a hearing, and we were responding to the recreation group's brief where they made this argument. So the first opportunity we had, we this issue had not been exhausted. And again, that's at page 8 of our. What prompted the supplemental briefs? That I'm not sure, Your Honor. Did they just file after the hearing? Did they just say, oh, we're going to file another brief, and here it is? I assume the district court asked for a supplemental briefing. You weren't involved? I was not. I was not the attorney in district court, Your Honor, no. And then it was after that that the judge entered his order? Yes. OK. So the judge had notice of our arguments, Your Honor. OK. Now, even if this decision did fall outside the range of alternatives, it's still not relevant to environmental concerns. It only reduced the environmental impacts of the agency's decision, so no supplement was required. Unless this court has any further questions, I would. All right. Thank you. Judge Golden? Yeah, no questions here. Thank you. Good morning. Good morning. May it please the court. My name is Matthew Bishop. I'm an attorney representing the Montana Wellness Association intervener appellant in this matter. MWA, the Wellness Association, has been involved in this travel planning process from the very beginning. They actually worked out a deal on the winter portion of the travel plan early on with motorized groups. And despite the district court's memorandum of opinion order, the winter portion was never part of this lawsuit and certainly was never challenged by plaintiffs in this case. My clients also attended all the earlier meetings, commented throughout the process, followed administrative appeal. And at the end of the day, the Wellness Association wasn't completely happy with the decision either. They certainly wanted to see more motorized routes closed in some of the sensitive wildlife areas where we have lots of good elk security. They wanted to see additional closures in the Smith River Corridor and in various inventory roses areas throughout the analyst area, as well as in the middle fork of the Judith WSA. So they didn't get everything they wanted. I guess the irony in this case is at the end of the day, the group that got the most, roughly 70% of all routes in the area are now open for motorized use are the ones who actually ended up being the most unhappy and filing the case. Obviously, at that point, my clients were compelled to file a motion to intervene to defend the decision and then file this appeal in response to the district court's order. I'd like to use my eight minutes today just to briefly touch on three points I want to emphasize from the briefs. The first one is on the issue, the legal issue of what the study act means or doesn't mean with respect to maintaining wellness character, I don't think this court even needs to go there necessarily in this case because the plaintiffs and the district court never challenged the underlying factual findings of the agency in this case. The record reveals that the Forest Service made a decision to close a number of motorized routes in the study area, specifically because there were concerns over resource damage. Trail 825, for instance, crossed the Middle Fork of the Jewish River over 20 times, was delivering significant levels of sediment to the stream and causing impacts to a native trout population there. So they were concerned and took steps to actually repair and close that trail in order to maintain the wilderness character. And in addition, there were a number of smaller segments and spur roads that were affecting the natural integrity of the area. And so they were taking steps to maintain wilderness character, not necessarily improve or enhance it. And those factual findings were never challenged by the plaintiffs and never challenged by the district court in his opinion. So I would ask this Court, could uphold the 2007 travel plan and reverse the district court on those grounds alone? So didn't the district court, though, say that what the travel plan did was to enhance? That's right, Your Honor. Did he just make that up out of thin air? Well, what Judge Haddon did is he ruled on this as a matter of law. He said, as a matter of law, the agency cannot take steps to improve or enhance wilderness character beyond 1977 levels by closing specific routes or a number of routes in the WSA. So it was purely a legal question. He didn't look into any of the factual underpinnings for that decision. So if he's wrong in that legal question, isn't it just reversed? Yeah, I think it would be reversed and sent back. And I would like to see the 2007 plan reinstated. But as a matter of law, I think he was incorrect. And that brings me to my second point, which is, as Alan mentioned, if you look at the issue, the legal issue, which really boils down to what did Congress really mean when it said maintain wilderness character? And I think if you employ traditional tools of statutory interpretation, and if you look at the plain language, the definition of maintain, to preserve, not degrade, if you look at the legislative history, which actually has, the House report has a whole section on motorized use. If you look at the overall purpose of the statute, section 2A, for instance, talks about how it's in furtherance of the Wilderness Act. And if you read it together, not only maintaining wilderness character, but also not prejudicing the areas, chances of being included in the system, and also sort of common sense, you'll see that they really intended to create a floor to maintain the wilderness character, below which the Forest Service cannot go. That's really the issue in the other case you heard this morning. If you were to apply it in other contexts, environmental work, I do a lot of forestry or water work. Maintaining water quality or maintaining wildlife habitat is such that if you make steps to improve water quality or habitat, you're maintaining it. So it's really a floor. But what Judge Haddon did here is he imposed the ceiling. He said not only is there a floor, but there's a ceiling above which the Forest Service cannot go. And that's what plaintiffs argued, and he said as a matter of law, exists. But if you look at the briefs, counsel for plaintiffs really, in support of that interpretation, he's looking only at a very narrow interpretation of the word maintain, and asking this court to look at it with blinders, to not look at the legislative history, to not look at the overall purpose of the statute, the Study Act itself, even though, coincidentally, plaintiffs' counsel actually cited extensively to the legislative history in the summary judgment briefing at the district court level. I think we understand the legal issues there. So the third point I wanted to make, briefly, is on the NEPA claim, which, admittedly so, is very confusing. I actually was the attorney at the district court level, and Judge Haddon did order supplemental briefs after this summary judgment argument, primarily because he wanted us to focus on the NEPA and Study Act issues, which now on appeal. At the opening briefs, I think plaintiffs raised a number of issues which he never addressed. But on the NEPA issue, I guess the issue there really boils down to whether and when the Forest Service can modify an alternative after the close of the comment period without having to prepare an entirely new supplemental EIS. And the standard is nicely laid out in the implementing regulations and a number of cases. And I think this Court's earlier decision in Half Moon Bay lays out the standard nicely. And at the end of the day, I think that issue really boils down to whether or not the changes here, there are two changes, qualify as an entirely new configuration, a different configuration with wildly different impacts, much like the situation, the First Circuit's decision in the Du Bois case, or the Tenth Circuit's decision in New Mexico, the BLM, where you really had a different situation. Like in the First Circuit case, you had a new ski lodge, new trails, cutting new areas. Or whether or not the situation here is more like the situation in the Third Circuit South Trenton case in the regs we talk about. It's really more of a reduced or scaled down version of a previously considered alternative. And here, we're talking about the dispersed vehicle camping prescription, for instance. It went from allowing dispersed vehicle camping off road within 300 feet of either side of a road or trail. So it basically created a 600 foot swath, narrowing that down to 70 feet of vehicle plus trailer length on either side, which is about 140 feet. So it's really more of a reduced scale, smaller version. And I think the same thing could be said for the ultimate decision. So even if you assume that the 1951 figure that Judge Haddon really glommed onto is correct, which we now know it's not. As Alan pointed out, it really is based on double counting. Those figures are not to be added up. But even if you assume that it's correct, at the end of the day, they'll authorize more vehicle use on 1,366 miles of routes. And again, that's a reduced, scaled down version of the alternatives presented for comment. And I have yet to find a case in any circuit where a court has ordered or required a supplemental EIS in that situation. We have a mitigation of impacts, a lessening of impacts at the end of the day. And again, there will be no motorized use in areas that weren't previously anticipated for reuse. It's just a smaller version. So it might be a good idea if your side saves some time for a rebuttal. Yeah. Thank you, Your Honor. With that, I'll save remaining time. OK. Thank you. Counsel? May it please the Court, my name is Paul Turk. I represent the plaintiffs, Russell Country Sportsmen. I want to start off with some factual clarifications here. First of all, a question arose about the nature of supplemental briefing. Mr. Brabender did correctly note that the government brought up this question about mileage figures for the first time in a post-hearing brief. It's actually the minute entry for the motion hearing is laid out in some detail. It's in the government's supplemental excerpts, or excuse me, the government's excerpts of record 305 and 306. What happened here was, as is typical in these cases, detailed summary judgment pleadings were presented. The court heard oral argument. That argument went for two hours or so. And at the end, the judge issued what, in my assessment, was essentially a speak now or forever hold your peace. We're going to have supplemental briefing. That's the first time any questions about mileage numbers came up. Per the local rule, we filed a detailed statement of facts. We cast the mileage numbers in exactly the same term that they were laid out in the complaint. I think it's instructive to read those. Let me just counsel. Did you think that they're right, that it's double counting, so that the numbers are actually wrong? I don't think so. I mean, in good faith, I wrote the complaint. I wrote the summary judgment pleadings. I tried to compare what the range of alternatives were that were presented in the EIS. And I tried to compare that to the decision in the record of decision. And so in determining what the range was, I went to the section of the EIS, which is always chapter 2, which said range of alternatives. I took the physical numbers out of the table, and I put them in my table. And then I came up with the same table out of the record of decision. And that's in our supplemental excerpts of record, page 24, page 25. And when you got their numbers in the supplemental briefing, did you go back and recalculate your original assumptions? I don't agree with their assumption. As we pointed out in our brief on appeal, they don't give you a consistent set of numbers. They give you several different sets of numbers. They point to different parts of the record. I mean, number one, I understand your question, who's right? And the answer is, I don't know, because there are different answers. And number two, in what were fairly protracted and expensive proceedings, we could not have been clearer about the numbers that we were relying on. And again, I think I know you have it. I know you've read it. I would encourage you to go back and read again. Well, that's why we have arguments so you can direct us back to what we've already read, which is true. I mean, there's a lot of briefs here. So yes, if you say so, we'll, and maybe without your even having said so, we'll go back and look. That's why I'm asking the question. I think there's beauty in simplicity. Let me read this. I mean, this is problem. Let me tell you what's bothering me about this. I will go back, we will go back, and look to see whether or not there's traction on what their argument is on numbers. I have difficulty if it's what happens is there's a factual dispute, and somehow the whole case turns on whether there's a clear answer to whether the numbers were misstated for whatever reason, and that if the true numbers are used, then the predicate for Judge Haddon's decision was, no fault of his, was wrong. Therefore, if the concern he had about being outside the range is wrong, then that would be the easy way to address it. We don't have to, we're just going through and preventing, because it's not just these people in this courtroom who are at, are interested in the outcome. It's the users and Congress, quite frankly, of the wilderness area. So we want to make sure that it isn't some litigation mistake that drives an erroneous legal conclusion. You understand where I'm going? That's, I certainly understand that, and I am confident that you will not find it was. Okay. We're talking about 600 miles here, and we're not talking about it being confined to this issue. We're talking about it on the dispersed camping issue as well. You have frequent occasion in the Ninth Circuit to look at these environmental impact statements, and you have a sense, I'm sure, of the mechanics. If there's some uncertainty about what the correct decision should be, then the agency creates what they call decision space. They have some variations and some options. So I'm going to shift a little bit to the dispersed camping issue. We didn't have an alternative that said 300 feet in alternative one, 200 feet in alternative two, 50 feet in three, and vehicle plus a trailer length. It was considered to be so basic to the decision that the 300-foot prescription was in every alternative in the draft environmental impact statement. And then in response to a handful of comments, it changed in every alternative to vehicle plus trailer length. That is shifting the target. Why is that so significant, though? I don't quite understand. Because... And they said, I asked counsel, and he said, you know, practically speaking, it's not a significant change. And I'm glad you brought that up, because I want to specifically address that. But first, why is that so significant? Because historically... From 300 to 70, what was it, 300 to 70? Right, because historically, that's where people camp on the national forest system. Unlike other units, there are not designated campsites. You don't show up and pay the ranger and go to spot 12. So there are historical campsites, some of which have little spur roads that go up to them. I mean, that's just the way it's done. And what counsel said today was the forest supervisor made a determination that there was not significant use of those. And your question was, was that discussed in the record of decision? And his response was, yes, it was. And he quoted you excerpts of record 293. Please read 293. 293 is a post-decisional document that was prepared at the behest of the regional forester after the close of comments, after the decision, after the administrative appeals were filed. If that is not a post hoc rationalization, I don't know what is. The problem with all of the government's arguments about minimizing impacts, reducing the scope, they all depend, they expect you to take on faith discussions that appeared nowhere in the record. And that is the easy answer to both of these appeals. Mr. Presso, who I will shamelessly ally myself with, I guess, put it well. He said, we understand they don't have perfect data. We only expect so much out of the Forest Service. But they have to cogently discuss how they got there. And the element that our case has more so than that case, uniquely in my experience, is that they simply did not reveal to the public what the decision options were. They selected an alternative that was outside of the range of alternatives. It's not a close call. You know, I understand they're concerned about where the target is. In arbitrary and capricious review, the target's pretty broad. The fact that they missed it by a mile on one side and then missed it by a mile the other direction doesn't create the need for the panel to indulge all these weighty questions about wilderness character. That's the best case that supports your position. We heard the government or the other side make reference to, too, Half Moon Bay and the case from the Tenth Circuit. Yeah. Well, number one, those cases, I think, support us, especially Dubois and New Mexico v. Richardson, because the 300-foot camping rule change, as well as the mileage changes, are changes in the configurations. It's not reducing in every particular, because, again, to reiterate the point, we don't know if it lessened the impacts. I mean, let me make an obtuse analogy. If you're driving into Portland and they're thinking about shutting down the 205 so that everybody's going to drive on I-84, I mean, you know, that might reduce the impacts. It might not. If people are sitting there in 30 minutes belching exhaust on the narrowed route, that's the whole reason we have NEPA, is so that the agency can look before it leaves. The public simply didn't have the opportunity to comment here. I want to talk a little bit, no one's asking me about it, but I want to talk about the exhaustion question. Same as with the mileage numbers raised very late in the game, only in the post-hearing briefs. As we pointed out in our brief, there's no procedural analysis or no procedural analogy to what the government asks you to do here. In other words, to invoke exhaustion on appeal to prevent consideration of an issue that the district court ruled upon below. In other words, the exhaustion cases are where we're going to understand the principles of exhaustion. And as I indicated before, I mean, in two particular places, and let me just cite them real quick, RxHerbs 24 and 25 and 32, you know, the government has previously admitted that the core proposition that our case is based upon, quote, the record of decision ultimately eliminated motorized travel from more routes than in any alternative proposed to the public, end quote. Federal defendants do not dispute this statement. You know, again, I think that the fundamental proposition was raised. Exhaustion only addresses the mileage numbers, doesn't address camping at all. So even if you were to extend it in the manner that they request, it doesn't resolve the whole case. I also think, I mean, we get into this question of procedure, I've never done a case where I saw further excerpts of record. The government seemed surprised that we didn't consider the record on appeal to include documents outside of the excerpts. I've always operated under the assumption that the panel wasn't going to go digging through, you know, tens of thousands of pages of district court proceedings or administrative agency proceedings. So I chose not to discuss the appeals that were not provided in the earlier excerpts. But if you go back and actually read the appeals, I think they do fairly present the question. In particular, look at government's further excerpts of record 164. It talks about how they actually picked a decision that was outside the range of alternatives, that there was a not only a viable but apparently preferred alternative that was never disclosed to the public. If you read the Ninth Circuit cases that are, again, in that different procedural context than this case, they talk about it's, you know, it's kind of a fair notice standard. You don't have to encamp the precise words, you know. I think that this case is a uniquely flawed record. It's not about the substance of the decision by any means. It's about technical NEPA compliance. And in hindsight, the agency boxed themselves in too narrowly and then tried to get outside that box. Okay. I think we got your point. I want to... How about the legal issue that was raised here by Judge Haddon's interpretation of the Study Act? I was going to go to that one next, and I'm glad you took me there. First of all, this question about enhancing the wilderness character comes straight out of the government's briefs. So I guess maybe I should be flattered by the conclusion that we somehow concocted that formula, but we didn't. I think we haven't talked about wilderness character as much in this case, but, you know, my clients are certainly interested in the other case. There was a lot of talk about wilderness character there. I'm interested in what Judge Haddon said. Judge Haddon just reiterated the standard that Judge Molloy originally... Maintain means maintain. It doesn't create a floor. It doesn't create a ceiling. It creates a target. There's a balance that needs to be struck between allowing existing uses to continue, because again, Congress did not designate wilderness, it didn't prevent those uses from occurring in the future, but at the same time, not allowing changes. And I will note, this could be non-motorized use as well as motorized use. I mean, there are places where non-motorized use is regulated by numeric allocations because too many people can have impacts. I want to talk about... What the agency did here in short is they shot at an illegal target. The target was to, quote, emphasize non-motorized recreation, to err on the side of eliminating motorized use. And critical in that analysis is to tie it to what was the character in 1977. In this case, we have... It appears to me we have better data in this case on 77 wilderness character than the Forest Service had in the Gallatin. And it's summarized in our brief at 26 and 27. There was a 1982 document, an analysis performed, and it looked at what 1977 character was. And it found that it didn't qualify. It said, you know, there were a lot of roads. There was use of the area. It said motorized recreation accounts for about 10,000 recreation visitor days. That was in 1977. So what the agency did, again, is it erred on the side of eliminating use. And Judge Haddon didn't perform this mile-by-mile rubric that has been suggested. He simply said that the statute says to maintain, and the agency didn't try to maintain. It enhanced. Yeah. And I think even... I think this... In the end, there's just a fundamental disagreement. I think even to the briefing in this case and the argument today, you know, on that side, they say that maintain means preserve at least the same level, if not more. And our argument, which... And we would contend we have good company with Judges Haddon and Malloy, is that maintain means keep approximately the same. And again, you know, we're not saying that it has to be perfect. I mean, obviously, we would like the Forest Service to have some latitude. I mean, you know, I could conceive of a scenario where we'd like to see use in a different place. Maybe even the Wilderness Association would agree that where use occurred in 1977 does not as well serve management objectives as perhaps in a different location in different vehicle types. It's a fluid standard, but it's got to be tied to that 1977 character, not to some present-day desire to, you know, create a better place that has more wilderness. So just to take your example of the 10,000 visitor days of use in 1977, what's a visitor day? What's that measuring? I wish I could answer that. Mr. Breitbender can... That's one of those agencies... It's a lot. So whatever it is, it's 10,000 visitor days. That's an objective number. That's what it came up with. So under your theory, they have to sort of keep it plus or minus a small amount at 10,000 visitor days. I think they could. I mean, if... No, not could. Have to. Well, I think they have to at least explain. I'm not trying to evade your question. I think this is kind of a crux, maybe more so of the other case, but they have to explain their reasoning. For instance, they could say, you know, we've decided this isn't a linear function. We could have use up to a certain level, at which point we impair wilderness character. So 10,000 is functionally equivalent to 15,000, and here's how we get there. They could... You know, we have whitewater boating cases where it's strictly regulated how many people float the river every day. We could, in theory, evolve to that kind of a system on other uses of the National Forest System. I'm not encouraging you to begin that new era, but the point is there's... It's not an impossible dilemma, as the Forest Service asks you to declare. There's simply a far more detailed discussion that has to occur in this analysis of wilderness character, and at some level, I perceive Mr. Presso and I to be in agreement on that point. Council, if I could ask one practical question, and maybe it's totally impractical, but I just wondered, have the recreational use parties and the environmental parties and the government ever sat down together with a skilled mediator to see if some agreement could be reached to resolve these issues? I'm glad you asked that question, Your Honor. We actually have. In fact, we've done it with no one more skilled than some of the folks in this room, and that's actually the Central Montana Wildlands case. In fact, Mr. Brabender and I were on that case several years ago, and that case involved the big snowy mountains on the Lewis and Clark Forest, where the Snowmobile Association, the Wilderness Association reached an agreement. The Forest Service blessed that agreement and adopted it as its decision, and then a successfully, and this court ultimately affirmed. Is there any possibility that the circuit's mediators, if they sat down with the recreational groups and the environmental groups and the Forest Service representatives, could find any solution that everyone would subscribe to? I'm over my time, if I can answer that question. Of course you can answer it. Two things to specifically respond to that. Number one, my experience with the circuit mediator's office, I have nothing but the highest of praise, and I would always encourage that effort as an alternative to litigation. I do want to say, and we provided at the beginning of our supplemental excerpts a snippet of some of the remedy proceedings. We ultimately agreed on a remedy in the district court here with at least the Forest Service, which authorizes far less use than- I think the question counts, so we appreciate that and your positive approach, but bottom line, do you think it's feasible or worthwhile exploring in this case? Nobody's going to mandate mediation. The simple question is, do you think this case, based on all your other experiences and whatever, do you think it's something that ought to be explored? I think we've effectively achieved the outcome here. I mean, I think- Well, that assumes- I guess what I would ask is- That assumes you prevail. Well, I was going to say, I mean, the question concerns me at some level because you wouldn't have much of an occasion to order mediation if you didn't send another case out. No, no, no, no. That's not the case. Not the case at all. Well, then that- The reason for panels, you know, normally, when I lived in the real world and was a lawyer and, you know, alternative dispute resolution was an emerging concept, the idea of mediating at the appellate level just didn't seem, you know, in the range. Now it turns out, as you say, our mediation office, and I say this to everybody, has a highly developed and very experienced staff and environmental cases have frequently been the cases that they've had very good success in. So it's just an avenue toward resolution, but it does not flag how the panel is going to come out. All we know is that at times we see that there are some things that might be better resolved by the folks who really know all of the ins and outs of the environmental law and the regulatory system and the history and the location and so on and so forth than us trying to step back and go off of the record we have before us. So it's just a question of whether you get a negotiated deal that's better than something that will come out of a panel of mortal, notwithstanding the, you know, the inferences or reputations of the contrary, we are mortal and we sometimes, you know, guess ourselves. Well, I want to offer two observations. I'm saying this not just to you, I'm saying to all the parties. Yeah, and I guess I would, I mean, we're kind of in the red zone, but I'd encourage Mr. Brabender to weigh in on this because, number one, I think... Don't ask him, I just want you to say, do you think it's futile, if you do? No, I think it would be greatly helpful. The presence of litigation, I appreciate what you just said about being mortals, but I will tell you that my perspective is that the presence of litigation has a tremendous influence on not only participants, but the agency, and what you're proposing... Litigation is pending until we make a decision, so... Well, and it would, I think it would engage, well, I mean, one of the problems you have is that you have different counsel, you have different arms of the agencies. It's not going to work if you, if, from your standpoint, would you be willing to participate? Absolutely. Okay, it's not a waste of your time. It's certainly not a waste of my time. Okay, good, thank you. I think that's the answer we needed. Thank you. Thank you. You want to get on the phone to reply? Your Honor, we have been able to resolve these issues in mediation in prior cases. We were not, I think they tried in the district court here to mediate this case, and it was unsuccessful. With an outside mediator? It was probably the magistrate usually does the mediation in district court. And in the previous case, we did engage in discussions with your office. Let me just cut to the chase. You heard what I said. Do you think it would be futile to consider it? No, I think that's all we need to know. Okay. So let me just briefly address this confusion over the miles analyzed in the draft EIS. This is something that, had the recreation group brought it to the agency's attention during the administrative proceedings, could have been clarified, and this court's review of this issue probably would not need to occur. Similarly, if the recreation groups believed that reducing motorized use in the forest would create some sort of negative environmental impact, they had the opportunity and obligation to introduce that evidence to the agency during the administrative proceedings. But because they did not raise this issue to the Forest Service, the record is absent of any such data or explanation. So it all comes back to the failure to exhaust administrative remedies on this claim as required by Congress in 7 U.S.C. 6912E. Now, as to the Forest Service, I guess the Forest Supervisor's statements that appear in our excerpts of record at page 293, that is not a post hoc rationalization. A post hoc rationalization is made by somebody other than the agency. And obviously, the Forest Supervisor is part of the agency. So it is an important part of the administrative record that this court must review under the relevant APA standard, which requires courts to review the whole record when reviewing agency action. Unless this court has any further questions, we would ask the court to reverse. No questions. All right. Did you have anything to add? All right. On the mediation issue, I just wanted to, I was an attorney of record on the district court level. You know, the parties really did try to work something out at one point. We got the maps out. We talked about specific routes. Would you be willing to live with this? And at the end of the day, I think it probably would be worthwhile. But the recreational groups were unwilling to give on the ones. Okay. You don't have to tell us that. Just if you don't think it's futile. I don't think it's futile. But it could be. You know, it's up to the parties. All we can do is suggest and offer our services. And mediation doesn't, in our experience, work well. If it's a cram down, that's not the idea. So it's, you know, you can all consult your clients and decide whether it's something that will give you the opportunity if we're so inclined. Okay. Okay. Thank you. Thank you all. We appreciate the argument. We'll take, as I say, a brief recess and come back and finish up. This is interesting. Okay. Thank you. All right. We'll take a short break. We'll be back in a few minutes.
judges: Fisher, Gould, Paez